**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| Grand Canyon Skywalk Development, LLC, | No. CV-12-08183-PCT-DGC |
|---|---|
| Petitioner, | **ORDER** |
| v. | |
| 'Sa' Nyu Wa, Inc., | |
| Respondent. | |

Petitioner Grand Canyon Skywalk Development, LLC ("GCSD") has filed an application for confirmation of an arbitration award.  Doc. 1.  Respondent 'Sa' Nyu Wa, Inc. ("SNW") has filed a response and a motion to vacate the arbitration award and dismiss this matter.  Doc. 7.  The petition and motion are fully briefed.  Docs. 12, 13, 14. The Court heard oral argument from both parties on January 24, 2012.  For the reasons that follow, the Court will grant GCSD's petition, confirm the arbitration award, and deny SNW's motion to vacate and dismiss.

**I.    Background.**

   **A.    Management Agreement.**

GCSD is a limited liability company with its principal place of business in Las Vegas, Nevada.  Doc. 1, ¶ 1.  SNW is a tribally chartered corporation of the Hualapai Tribe with its principal place of business in Arizona.  *Id.*, ¶ 2.  On December 31, 2003, the parties entered into a Development and Management Agreement ("the 2003

Agreement") for the construction and operation of a glass viewing bridge ("the Skywalk") and related facilities at the south rim of the Grand Canyon on the Hualapai Indian Reservation.  Doc. 1, ¶ 5; *see* Doc. 1-1 at 1-50.  The 2003 Agreement provides that "[a]ny controversy, claim or dispute arising out of or related to this Agreement shall be resolved through binding arbitration" pursuant to the rules of the American Arbitration Association ("AAA").  Doc. 1-1 at 43, 2003 Agreement, § 15.4(a).

### B.   Arbitration.

After the Skywalk opened to visitors in March of 2007, controversies arose between GCSD and SNW over such things as completion of infrastructure, bookkeeping, and payment of management fees.  Doc. 1, ¶ 7; *see* Doc. 1-1 at 52-72, GCSD's Amended Arbitration Complaint.  In July of 2011, GCSD sought to compel arbitration of these issues in the Hualapai Tribal Court.  Docs. 1, ¶ 8; 1-1 at 75, ¶¶ 1.  That court found that SNW had waived its sovereign immunity for the limited purpose of mandatory arbitration, but had not waived its immunity in the Hualapai Tribal Court.  Rather, the 2003 Agreement provided that efforts to compel arbitration should be made in federal court.  The Tribal Court therefore found that it was without jurisdiction to compel arbitration.  Doc. 1-1 at 76-77, ¶¶ 7, 10-11, Aug. 2, 2011 Hualapai Tribal Court Order.

Thereafter, GCSD filed a notice of arbitration with the AAA and delivered a copy to SNW.  Doc. 1, ¶ 9.  SNW objected to the jurisdiction of the arbitration tribunal on the grounds that it had only waived sovereign immunity for purposes of arbitration when a federal court issued an order compelling arbitration.  *See* Doc. 1-2 at 2.  Arbitrator Shawn Aiken denied the objection and confirmed jurisdiction, finding that SNW had agreed to arbitration, and that while it had also waived sovereign immunity for a federal court to compel arbitration, the 2003 Agreement did not require an order compelling arbitration.  Doc. 1-2 at 2, November 21, 2011 Arbitration Order.

The arbitration proceeded with SNW's participation until early February of 2012, when the Hualapai Tribal Council passed a declaration of taking by eminent domain of GCSD's interests in the 2003 Agreement and the Tribe took physical possession of the

Skywalk.  Doc. 1, ¶¶ 14-15.[1]  The Tribe then submitted a declaration of taking to the Hualapai Tribal Court and requested that the court issue an order declaring that absolute title in GCSD's contractual interests had vested in the tribe, subject to just compensation estimated to be about $11,040,000.  Doc. 1-2 at 151-52.  The Tribe also requested a temporary restraining order ("TRO") to prevent GCSD from destroying or removing any property from the Skywalk, which the Tribal Court granted.  *See* Doc. 1-2 at 157.

The Tribe then filed a notice of dismissal in the arbitration action, attempting to dismiss GCSD counsel and GCSD's arbitration claims on the grounds that the taking had substituted the Tribe in the place of GCSD for all purposes under the 2003 Agreement. *See* Doc. 7-2 at 182-83.  The arbitrator ruled that the parties to the arbitration remained the same and that the Tribe was a non-party and therefore without authority to dismiss the arbitration.  Doc. 7-2 at 185, March 14, 2012 Arbitration Order.  The arbitrator ordered arbitration to proceed with a final hearing scheduled for April 2012.  *Id.*

On March 26, 2012, this Court issued an order in a related case in which GCSD had sought to enjoin the Tribe's taking of its property and contract interests.  *Grand Canyon Skywalk Development, LLC. v. 'Sa' Nyu Wa, Inc.*, No. CV12-8030-PCT-DGC, Doc. 58.  The Court found that principles of comity required GCSD to exhaust its remedies in tribal court and that GCSD had not shown that any of the recognized exceptions to tribal court exhaustion applied.  *Id.* at 14.  The Court stayed the action and required GCSD to exhaust its tribal court remedies.  *Id.* at 15.

Following this Court's order, the arbitrator issued a supplemental order postponing the final arbitration hearing until July 16-20 and July 23-27, 2012, in order to give SNW and the Tribe an opportunity to obtain an order from either the Hualapai Tribal Court or this Court that the Tribe had lawfully taken GCSD's interests in the 2003 Agreement, including its intangible contract claims that had accrued prior to the Tribe's exercise of

---

[1] SNW answered the complaint in arbitration, paid its portion of the arbitration fee, and engaged in arbitration discovery before asserting that it had the right to terminate the proceedings in light of the condemnation.  Doc. 1, ¶ 12.

1    eminent domain.  Doc. 12-5 at 30-31.  The arbitrator stated that, in the absence of such an

2    order, he would proceed with the final hearing.  *Id.* at 31.

3         The Tribe subsequently asked the Tribal Court to enjoin the arbitration.  Doc. 1,

4    ¶ 17; *see* Doc. 1-2 at 156.  Upon finding that the Tribal Council had authorized SNW to

5    waive its sovereign immunity for purposes of the 2003 Agreement, the Tribal Court

6    ordered that the arbitration could proceed.  Doc. 1-2 at 160, Aug. 3, 2012 Hualapai Tribal

7    Court Minute Entry and Order.[2]

8         The final arbitration hearing was held on July 16-20, 2012.  GCSD presented

9    extensive documentary and testimonial evidence.  Doc. 1, ¶ 18.  SNW did not attend.  *Id.*

10   After considering the testimony of witnesses, the briefs of both parties, and the exhibits

11   admitted into evidence, the arbitrator ruled in favor of GCSD and against SNW on nearly

12   all of GCSD's claims.  *Id.*, ¶ 19; *see* Doc. 1-2 at 84-130, August 16, 2012 Arbitration

13   Order.   The arbitrator awarded GCSD $28,572,810.25, including attorneys' fees and

14   costs.  *Id.* at 130.  Judgment of the award was transmitted to the parties on August 17,

15   2012.  *See* Doc. 1-2 at 162.

16         SNW did not file any action to modify, correct, or vacate the award, and the award

17   became final on September 6, 2012.  Doc. 1, ¶¶ 21-22.  GCSD filed this petition for

18   confirmation of the award five days later.

19   **II.**     **The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq.**

20         Under the FAA, "[a] written provision in . . . a contract evidencing a transaction

21   involving commerce to settle by arbitration a controversy thereafter arising out of such

22   contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall

23   be valid, irrevocable, and enforceable . . . ."  9 U.S.C. § 2; *see, e.g., Circuit City Stores,*

24   *Inc. v. Adams*, 532 U.S. 105, 113-19 (2001); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.,*

25   207 F.3d 1126, 1130 (9th Cir. 2000); *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42

26

27         [2] Although the Hualapai Tribal Court entered this order on August 3, 2012, the court rendered its opinion on July 15, 2012, one day prior to the commencement of the

28   rescheduled final arbitration hearing.  *See* Doc. 1-2 at 160, Aug. 3, 2012 Hualapai Tribal Court Minute Entry and Order.

F.3d 1292, 1294 (9th Cir. 1994), *cert. dismissed*, 515 U.S. 1187 (1995).  "Although [a] contract provides that [state] law will govern the contract's construction, the scope of the arbitration clause is governed by federal law."  *Tracer Research Corp*, 42 F.3d at 1294 (citing *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1463 (9th Cir. 1983)); *see Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) (holding that FAA "not only placed arbitration agreements on equal footing with other contracts, but established . . . a federal common law of arbitrability which preempts state law"); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) ("Federal substantive law governs the question of arbitrability."); *Chiron Corp.*, 207 F.3d at 1130-31 (holding that "district court correctly found that the federal law of arbitrability under the FAA governs the allocation of authority between courts and arbitrators" despite arbitration agreement's choice-of-law provision).[3]

"Notwithstanding the federal policy favoring it, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  *Tracer Research Corp*, 42 F.3d at 1294 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)); *see French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 908 (9th Cir. 1986).  Where the arbitrability of a dispute is in question, a court must look to the terms of the contract.  *See Chiron Corp.*, 207 F.3d at 1130.  "'Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  *Simula*, 175 F.3d at 719 (quoting *Moses H. Cone Mem'l  Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983)); *see French*, 784 F.2d at 908.

---

[3]Although "'courts may not invalidate arbitration agreements under state laws applicable *only* to arbitration provisions,' general contract defenses such as fraud, duress, or unconscionability, grounded in state contract law, may operate to invalidate arbitration agreements."  *Circuit City Stores*, 279 F.3d at 892 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)) (emphasis in *Doctor's Assocs.*).

"If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award[.]"  9 U.S.C. § 9.  Upon application, "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed [in the FAA.]"  *Id.*

Courts will vacate an award only where there is evidence that it was (1) "procured by corruption, fraud, or undue means"; (2) "there was evident partiality or corruption in the arbitrators"; (3) "the arbitrators were guilty of misconduct . . . by which the rights of any party have been prejudiced"; or (4) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10; *Coutee v. Barington*, 386 F3d 1128 (9th Cir).  "[T]he court's function in confirming or vacating an arbitration award is severely limited.  If it were otherwise, the ostensible purpose for resort to arbitration, i.e., avoidance of litigation, would be frustrated."  *Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp*., 274 F.2d 805, 808 (2d Cir. 1960).

**III.    Discussion.**

SNW asks the Court to deny GCSD's petition, vacate the arbitration award, and dismiss this action for several reasons.  First, the Court has no jurisdiction to confirm the arbitration award because the 2003 Agreement limited SNW's waiver of sovereign immunity to enforcing awards for specific performance only, not money damages.  Doc. 7 at 5-6.  Second, the 2003 Agreement limited SNW's waiver of sovereign immunity in accordance with the Hualapai Constitution, and the Constitution requires a special vote of tribal members to approve waivers for liability in excess of $250,000.  No vote authorized a higher amount in this case.  *Id.* at 6-7.  Third, the arbitrator exceeded his powers because the 2003 Agreement authorized arbitration to commence only when ordered by a federal court, which did not occur in this case.  Fourth, the arbitrator exceeded his powers when he failed to terminate the arbitration after the Tribe

condemned GCSD's interests in the 2003 Agreement.  *Id.* at 7-13.  The Court will address each of these arguments in turn.

### A. Does the Court Have Jurisdiction to Enforce Money Damages?

Section 15.4(d)(iii) of the 2003 Agreement states that SNW's waiver of sovereign immunity is limited to "an action in a federal court of competent jurisdiction in Arizona to either (i) compel arbitration or (ii) enforce a determination by an arbitrator requiring SNW to specifically perform any obligation under this Agreement (other than an obligation to pay any money damages under § 15.4(d)(ii))."  Doc. 7 at 6; Doc. 7-1 at 95. Section 15.4(d)(ii), to which the parenthetical limitation in § 15.4(d)(iii) refers, states that "[a]ny money damages will be limited to the assets that are solely owned by SNW.  No money damages, awards, fines, fees, costs or expenses can be brought or awarded against the Nation in arbitration, judicial, or governmental agency action."  Doc. 7-1 at 95.

SNW argues that the parenthetical statement in § 15.4(d)(iii) acts as a limitation on its waiver of sovereign immunity and deprives the Court of jurisdiction to enforce any arbitration damages awards against it.  Doc. 7 at 6.  The Court is not persuaded.

There can be no doubt that SNW waived its sovereign immunity with respect to damages claims arising out of the 2003 Agreement that are asserted in arbitration. Section 15.4(a) of the 2003 Agreement states, in its opening sentence, that "[a]ny controversy, claim or dispute arising out of or related to this Agreement shall be resolved through binding arbitration."  Doc. 7-1 at 94.  The agreement does not say that damages claims are unavailable; it applies to *any* controversy, claim, or dispute.

Section 15.4(d) states that "SNW expressly waives its sovereign immunity with respect to all disputes arising out of this Agreement to the extent permitted under the Constitution of the Nation."  Doc. 7-1 at 95.  Like the opening statement in § 15.4(a), this provision is not limited to non-damages claims; it applies to "all disputes" arising under the agreement.  Although the waiver is granted only "to the extent permitted" by the Tribal Constitution, SNW does not argue that the Constitution prohibits a waiver of sovereign immunity for damages awards in arbitration.

1    The next sentence of § 15.4(d) states that "SNW's waiver of sovereign immunity

2    from suit is specifically limited by the Constitution of the Nation to the following actions

3    and judicial proceedings[.]"  *Id.*  The sentence is followed by three categories of actions –

4    actions as to which SNW is waiving sovereign immunity.

5    The first category, contained in § 15.4(d)(i), consists of actions brought by the

6    "Manager," which is defined in the 2003 Agreement to mean GCSD.  *Id.*; Doc. 7-1 at 53

7    (§ 1.1).  The first category thus makes clear that SNW is waiving its sovereign immunity

8    for arbitration proceedings commenced by GCSD, as occurred in this case.

9    The second category, contained in § 15.4(d)(ii), reads as follows:  "Any money

10   damages will be limited to the assets that are solely owned by SNW.  No money

11   damages, awards, fines, fees, costs or expenses can be brought or awarded against the

12   Nation in arbitration, judicial or government agency action[.]"  Doc. 7-1 at 95.  This

13   provision makes clear that sovereign immunity is waived for money damages awarded

14   against SNW in arbitration.  Sovereign immunity is not waived for money damages

15   claims against the Tribe.

16   The third category, contained in § 15.4(d)(iii), reads as follows:  "[a]n action in a

17   federal court of competent jurisdiction in Arizona to either (i) compel arbitration or (ii)

18   enforce a determination by an arbitrator requiring SNW to specifically perform any

19   obligation under this Agreement (other than an obligation to pay any money damages

20   under § 15.4(d)(ii))."  *Id.*  This provision specifically refers to § 15.4(d)(ii) and

21   recognizes that it permits an award of "money damages."

22   The Court concludes from these provisions that SNW clearly waived its sovereign

23   immunity with respect to money damages awarded in an arbitration of claims arising

24   under the 2003 Agreement.  No other reading of the agreement is plausible.  The

25   arbitrator and Tribal Court both reached the same conclusion (*see* Docs. 1-1 at 76-77,

26   Aug. 2, 2011 Hualapai Tribal Court Order, ¶¶ 10, 13; 1-2 at 3, Nov. 21, 2011 Arbitration

27   Order; 1-2 at 159, Aug. 3, 2012 Hualapai Tribal Court Order), and counsel for SNW

28   conceded at oral argument that SNW waived its sovereign immunity for money damages

1    in a properly commenced arbitration.[4]

2         The question, then, is whether the parties agreed that money damages could be

3    awarded against SNW in an arbitration proceeding and, at the same time, agreed that such

4    an award could not be enforced in any court.  SNW has already successfully argued in

5    Tribal Court – consistent with the language of § 15.4 – that actions regarding the

6    arbitration provision must be brought in federal court.  *See* Doc. 1-1 at 75-77, Aug. 2,

7    2011 Hualapai Tribal Court Order.  Thus, if an arbitration award cannot be enforced in

8    federal court, it cannot be enforced in any court.  Odd as it sounds, SNW takes the

9    position in this litigation that § 15.4(d)(iii) means that SNW waived its sovereign

10   immunity to permit money damages to be awarded in an arbitration proceeding, but did

11   not waive its sovereign immunity to permit a court to enforce the award.  Such a reading

12   would, of course, render SNW's explicit money-damages waiver wholly illusory.  An

13   award that is unenforceable is tantamount to no award at all.

14        In addition to the sheer implausibility of SNW's interpretation, the Court finds that

15   the interpretation conflicts with several key provisions in the 2003 Agreement.

16        First, § 15.4(a) is titled "Mandatory Arbitration" and its first sentence states that

17   the parties agree to "binding arbitration."  Doc. 7-1 at 94.  These phrases are entirely

18   inconsistent with an agreement that permits arbitration of money damages but forbids the

19   enforcement of any award.  When asked during oral argument whether SNW's reading of

20   the arbitration provision renders the provision meaningless, SNW's counsel suggested

21   that the parties may have intended the arbitration to be merely advisory – that if the

22   parties were cooperating, SNW might agree to pay GCSD an award granted by an

23   arbitrator.  This interpretation directly contradicts the parties' agreement to "binding

24   arbitration."  *Id.*

25        Second, as already noted, the agreement expressly contains two broad waivers of

---

26        [4] Although the Court need not rely on them given the clear language of the 2003
27   Agreement, cases have held that an express agreement to binding arbitration, as is
     contained in this agreement, itself constitutes a waiver of sovereign immunity.  *See C & L
28   Enterprises, Inc. v. Citizen Band, Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 420
     (2001); *Rosebud Sioux Tribe v. Val-U Construction*, 50 F.3d 560 (8th Cir. 1995).

sovereign immunity by SNW.  Section 15.4(a) authorizes arbitration of *any* claim arising out of the 2003 Agreement.  Section 15.4(d) provides that SNW "expressly waives its sovereign immunity with respect to *all* disputes arising out of this Agreement[.]"  Doc. 7-1 at 95 (emphasis added).  Such broad waivers are inconsistent with a reading of the agreement which states that money damages for claims arising out of the agreement are unenforceable.

Third, the section of the 2003 Agreement that sets forth specific limitations on SNW's waiver of sovereign immunity does not say that money damages are excluded.  To the contrary, it recognizes that money damages may be recovered against SNW: "Any money damages will be limited to the assets that are solely owned by SNW." § 15.4(d)(ii).  The same provision states in emphatic language ("money damages, awards, fines, fees, costs or expenses") that the Tribe is not waiving its immunity with respect to any form of money damages, a clarification that makes SNW's waiver of such immunity even more overt and intentional.

Fourth, several provisions refer to possible actions in federal courts, and those provisions do not support SNW's cramped reading.  Section 15.4(b) provides broadly that "[t]he venue and jurisdiction for (x) any litigation under this Agreement and (y) all other civil matters arising out of this Agreement shall be the federal courts in the State of Arizona, and located in or around Peach Springs, Arizona."  Doc. 7-1 at 95.  Section 15.4(a) contains a statement about enforcement of any arbitration award:  "Judgment upon the award (as limited by Section 15.4(d)) rendered by the arbitrator may be enforced through appropriate judicial proceedings in any federal court having jurisdiction."  *Id.* at 94.  This sentence specifically refers to enforcement of arbitration awards.  Although this sentence includes a cross-reference to § 15.4(d), it does not specify any particular provision of § 15.4(d).  As noted above, that section expressly waives SNW's sovereign immunity for "all disputes" under the 2003 Agreement and contains a provision specifically recognizing that money damages may be awarded against SNW to the extent of its assets.  *Id.*, §§ 15.4(d), 15.4(d)(ii).  Section 15.4(d)(iii)

contains the specific performance provision on which SNW relies for this argument, but the cross-reference in § 15.4(a) refers to all of § 15.4(d), not just the subpart upon which SNW focuses.

In summary, the Court cannot conclude that the 2003 Agreement permits an award of money damages against SNW in arbitration, as it clearly does, and yet prohibits enforcement of that award in any court at any time.  Such a nonsensical reading does not comport with SNW's clear waiver of sovereign immunity with respect to money damages and cannot be squared with the provisions discussed above.

What then does § 15.4(d)(iii) mean when it limits the waiver of sovereign immunity to "[a]n action in a federal court of competent jurisdiction in Arizona to . . . enforce a determination by an arbitrator requiring SNW to specifically perform any obligation under this Agreement (other than an obligation to pay any money damages under § 15.4(d)(ii))"?  *Id.*  The interpretation most consistent with the rest of § 15.4 is that the parenthetical refers to the prohibition in § 15.4(d)(ii) on money damage awards against the Tribe. Reading the language to prohibit federal court enforcement of an arbitration award of money damages against SNW – when the agreement specifically allows money damages awards against SNW – would create too great an incongruence among the clear statements in § 15.4.

The Court must interpret the 2003 Agreement "so that every part is given effect," and "each section of [the] agreement must be read in relation to each other to bring harmony, if possible, between all parts of the writing." *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 973 (Ariz. 2010) (internal citations and quotation marks omitted).  The reading of one provision "must not render a related provision meaningless." *Id.*; *see also Gesina v. Gen. Elec. Co.*, 780 P.2d 1384, 1386 (Ariz. App.1988) (Ariz. App. 1982) (accord); *Norman v. Recreation Ctrs. of Sun City, Inc.*, 752 P.2d 514, 517 (Ariz. App. 1988) (same).  Construing the limiting clause in § 15.4(d)(iii) as a reiteration of the agreement's exclusion of money damages against the Tribe, and not as a prohibition against any enforcement of arbitration-awarded money damages against SNW, gives

1    effect to this provision in a manner consistent with the contract as a whole.

2         SNW argues that the Court must resolve any ambiguity against a waiver of

3    sovereign immunity.  Docs. 7 at 5; 14 at 3 (citing *Pan Am. Co. v. Sycuan Band of Mission*

4    *Indians*, 884 F.2d 416, 418 (9th Cir. 1989); *Missouri River Services, Inc. v. Omaha Tribe*

5    *of Nebraska*, 267 F.3d 848, 852 (8th Cir. 2001) ("[I]f a tribe 'does consent to suit, any

6    conditional limitation it imposes on that consent must be strictly construed and

7    applied.'") (internal citation omitted)).   The Court concludes, however, that SNW's

8    waiver of sovereign immunity is not ambiguous.  SNW plainly has waived its immunity

9    with respect to an arbitration award of money damages that may be enforced against its

10   assets.   True, the Court must view waivers of sovereign immunity with care, but the

11   Court need not indulge nonsensical readings of the parties' agreement.   The Court

12   concludes that it has jurisdiction under the terms of the 2003 Agreement to enforce an

13   arbitration award of money damages against SNW.

14        **B.      Does the Hualapai Constitution Limit SNW's Damages to $250,000?**

15        SNW's express waiver of sovereign immunity is limited under the 2003

16   Agreement "to the extent permitted under the Constitution of the Nation."  Doc. 7-1 at

17   95; 2003 Agreement, § 15.4(d).  SNW argues that this limitation encompasses Article

18   XVI, Section 2 of the Hualapai Constitution, which states that "[e]xpress waivers of

19   sovereign immunity shall require the approval of at least thirty (30) percent of eligible

20   voters of the Tribe voting in a special election if the waiver may . . . expose the Tribe to

21   liability in excess of $250,000 or its equivalent."  Doc. 7 at 6-7; *see* Doc. 7-1 at 123,

22   Hualapai Const., art. XVI, sec. 2(b)(1).  SNW argues that because no such vote approving

23   liability ever took place, the Court can at most confirm an arbitration award of $250,000.

24   Doc. 7 at 7.  Again, the Court is not persuaded.

25        The 2003 Agreement makes no reference to a $250,000 limitation.  *See* Doc. 7-1

26   at 95, § 15.4(d).  If this limitation applies to the agreement, therefore, it is not because the

27   parties expressly agreed to it, but because the 2003 Agreement waives sovereign

28   immunity in § 15.4(d) only "to the extent permitted under the Constitution of the Nation."

*Id.*   The key question, therefore, is what the Constitution means.   The language of the Constitution requires a vote of tribal members to approve waivers that would "expose the *Tribe* to liability in excess of $250,000 or its equivalent."   Doc. 7-1 at 123 (emphasis added).   The provision says nothing about tribal corporations, and SNW has cited no other provision of the Constitution and no tribal court decision suggesting that the word "Tribe" in the Hualapai Constitution includes all tribal business entities.   Constitutional provisions generally are to be given their plain and ordinary meaning, *Martin v. Hunter's Lessee*, 14 U.S. 304, 326 (1816); *Paulson v. City of San Diego*, 294 F.3d 1124, 1129 (9th Cir. 2002), and the word "Tribe" with a capital "T" clearly means the Hualapai Tribe. The Preamble to the Hualapai Constitution confirms this interpretation, stating that the Constitution is created by "the members of the Hualapai Tribe" to protect "the common good and well-being of the Tribe and its members," to ensure "the political integrity of the Tribe," and to preserve "the inherent sovereign rights and powers of an Indian Tribe." Doc. 7-1 at 121.   These introductory provisions clearly suggest that "Tribe" as used in the Constitution means the Hualapai Tribe.

Moreover, the structure of the 2003 Agreement suggests that the parties did not intend to protect the Tribe by incorporation of the $250,000 limit.   Instead, § 15.4(d)(ii) specifically states that the Tribe cannot be liable for money damages and that SNW can be liable only to the extent of its corporate assets.   With this provision in place, the Tribe, which wholly owns SNW, could control its overall exposure by controlling the amount of assets in the corporation.

In addition, the Plan of Operation approved by the Tribal Council for SNW specifically authorized SNW to waive its own sovereign immunity "for any particular agreement, matter or transaction as may be entered into to further the purposes of the Corporation."   Doc. 12-2 at 9, SNW Plan of Operation, art. XI, § 11.2.   The Plan states that such waivers do not require approval by the Tribe, and, consistent with the Constitutional provision, that "[a]ny waiver of immunity by the Corporation . . . shall not create any liability, obligation, or indebtedness either of the Hualapai Indian Tribe, or

payable out of assets, revenues, or, income of the Hualapai Indian Tribe." *See* Doc. 12-2 at 9, SNW Plan of Operation, art. XI, §§ 11.3 & 4. The Plan of Operation appears to deal with liability limits in this way rather than assuming that the $250,000 limit on Tribal waivers somehow applies to SNW. To the extent SNW now asserts that it was not authorized by the Tribal Council or the Constitution to provide the waiver of sovereign immunity clearly set forth in the 2003 Agreement, the Court notes that SNW expressly represented and warranted in the agreement that it had "full power and authority under its organizational documents and from the Nation to enter into and perform its obligations under this Agreement." Doc. 7-1 at 93 (§ 14.1(a)).

SNW's citations to cases in which courts have found that a tribe's sovereign immunity extended to tribal corporations do not compel a different conclusion. *See* Doc. 14 at 3. In *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046-47 (9th Cir. 2006), the Ninth Circuit found that a casino that operated as "an arm of the Tribe" and whose profits "inure[d] to the benefit of the Tribe" was entitled to the same sovereign immunity as the tribe. But in *Allen* there was no waiver of sovereign immunity as there is here, and the court found that no statutory exceptions to sovereign immunity applied. *Id.* at 1047-48. Similarly, in *Cook v. AVI Casino Enters. Inc.*, 548 F.3d 718, 726 (9th Cir. 2008), the Ninth Circuit affirmed on the basis of *Allen* that a casino whose profits inured to the Tribe enjoyed the same sovereign immunity as the Tribe. There was no question in *Cook* that the casino had ever waived its sovereign immunity. *Id.*

Although these cases stand for the general proposition that tribal immunity applies to tribal corporations, they do not address the specific question presented here – whether tribe-specific immunity provisions of a particular tribe's constitution apply to all tribal entities, including those that never mention them in their governing documents and that give express waivers of sovereign immunity with the approval of tribal authorities. SNW cites no cases in which an issue such as this, that predates contract formation and rests on a question of interpretation of tribal law, serves as a defense to an express waiver of sovereign immunity contained in the contract to which both parties agreed. The Court

concludes that limitation on SNW's waiver of sovereign immunity is clear in the 2003 Agreement – the waiver applies only to the extent of the corporation's assets – and that the Constitutional provision cited by SNW, given its plain meaning, does not impose a greater limitation than this that is never mentioned in the 2003 Agreement.

## C.   Did the Arbitrator Exceed His Powers in Maintaining Jurisdiction?

SNW argues that the arbitrator exceeded his powers when he found he had jurisdiction to hear GCSD's claims.  SNW asserts that jurisdiction was not proper under the 2003 Agreement because GCSD did not first obtain a federal court order compelling arbitration, and that once the arbitration was underway, the Tribe's exercise of eminent domain over GCSD's contract rights resulted in the Tribe stepping into the shoes of GCSD with power to dismiss the arbitration.  Doc. 7 at 7-14.  The Court will address these arguments separately.

### 1.   Was a Court Order Required to Commence Arbitration?

Section 15.4(a) of the 2003 Agreement describes how arbitration is to be commenced, the rules under which it is to be conducted, and how any award can be enforced.  It reads:

> 15.4 <u>Arbitration, Governing Law, Jurisdiction</u>.
>
> (a)   <u>Mandatory Arbitration</u>. Any controversy, claim or dispute arising out of or related to this Agreement shall be resolved through binding arbitration . . . Either party may request *and thus initiate* arbitration of the dispute by written notice ("Arbitration Notice") to the other party . . . . The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect, as limited by Section 15.4(d). Judgment upon the award (as limited by Section 15.4(d)) rendered by the arbitrator may be enforced through appropriate judicial proceedings in any federal court having jurisdiction[.]

Doc. 7-1 at 94 (emphasis added).

This section clearly states that a party may "initiate" arbitration by sending the Arbitration Notice.  No court approval or court order is required.

SNW contends that arbitration can be commenced under the agreement only by

1    obtaining a court order compelling arbitration.   SNW rests its argument on the

2    § 15.4(d)(iii) provision that SNW's waiver of sovereign immunity is limited to "an action

3    in a federal court of competent jurisdiction in Arizona to . . . compel arbitration[.]"

4    Doc. 7 at 6; Doc. 7-1 at 95, 2003 Agreement, § 15.4(d)(iii).  SNW reads this provision as

5    modifying § 15.4(a) quoted above.  The Court does not agree.

6         Section 15.4(a) clearly sets forth the parties' agreement to binding arbitration and

7    how it could be initiated.   Section 15.4(d) sets forth SNW's waiver of sovereign

8    immunity and the limitations on waiver.  The clear intent of these provisions is that either

9    party may "initiate" arbitration by sending the notice required in § 15.4(a), and that if an

10   action to compel the other party to participate becomes necessary, SNW waived its

11   sovereign immunity for purposes of an action to compel brought in federal court.  By

12   providing for the contingency that a party may be unwilling to arbitrate, the parties did

13   not alter the method by which arbitration could be commenced.

14        As the arbitrator noted when confronted with this issue, the fact that a federal

15   court can compel arbitration does not mean that it must compel arbitration for the parties'

16   agreement to have effect.  *See* Doc. 1-2 at 3.  SNW consented to binding arbitration in

17   § 15.4(a), and GCSD followed the prescribed procedure for initiating arbitration.  The

18   arbitrator did not exceed his powers when he determined that AAA had jurisdiction under

19   the 2003 Agreement to hear GCSD's claims.[5]

20              **2.      Did the Condemnation Action Moot the Arbitration?**

21        After the arbitration had commenced, the Hualapai Tribal Council passed a

22   declaration of taking by eminent domain of GCSD's interests in the 2003 Agreement.

23   Doc. 1, ¶¶ 14-15.  In addition to taking physical possession of the Skywalk itself, the

24   Tribe filed a notice of dismissal in the arbitration action, attempting to dismiss GCSD's

25   _____

26        [5] SNW's argument that the Tribal Court's decision denying GCSD's motion to
     compel arbitration somehow required GCSD to obtain a federal court order before
27   proceeding with arbitration is wholly unconvincing.  The Tribal Court was not asked to
     determine how arbitration could be commenced under the 2003 Agreement.  It merely
28   held that *if* a court order was sought to compel arbitration, it must be sought in federal
     court rather than tribal court as provided in § 15.4(d)(iii).  Doc. 12-5 at 2-6.

counsel and arbitration claims on the ground that the taking had substituted the Tribe in the place of GCSD for all purposes under the 2003 Agreement.  *See* Doc. 7-2 at 182-83. The arbitrator ruled under AAA rules that the parties to the arbitration were SNW and GCSD, that the Tribe had never intervened in the arbitration, and that the Tribe was therefore without authority to dismiss the arbitration.  Doc. 7-2 at 185, March 14, 2012 Arbitration Order.  The arbitrator nonetheless gave SNW and the Tribe time to obtain an order from either this Court or the Tribal Court declaring the effect of the Tribe's condemnation on the ownership of GCSD's claims.  Doc. 12-5 at 30-31, March 27, 2012 Supplemental Arbitration Order.  The Tribe asked the Tribal Court to enjoin the arbitration on the basis of the condemnation, but the Tribal Court declined.  Doc. 1-2 at 160, Aug. 3, 2012 Hualapai Tribal Court Minute Entry and Order.  The Arbitrator proceeded with the final arbitration hearing.

SNW now argues that "[t]he legal and practical effects of the condemnation were that the Tribe immediately stepped into GCSD's shoes under the Skywalk Agreement." Doc. 7 at 12.  It further argues that all rights that GCSD had under the 2003 Agreement immediately vested with the Tribe, including the right to arbitrate GCSD's claims, thus giving the Tribe power to fire GCSD's arbitration counsel and dismiss the arbitration.  *Id.* SNW argues that the arbitrator exceeded his powers when he refused to terminate the arbitration on the basis of the Tribe's notice of dismissal.  Doc. 7 at 13.

In previous proceedings initiated in this Court by GCSD, SNW took the position that the Court should not rule on the effect of the condemnation, but instead should require GCSD to exhaust Tribal Court remedies.  The Court agreed, and required GCSD to litigate the effect of the condemnation in Tribal Court first.  *Grand Canyon Skywalk Development, LLC. v. 'Sa' Nyu Wa, Inc.*, No. CV12-8030-PCT-DGC, Doc. 58 at 14. GCSD and SNW currently are engaged in Tribal Court litigation over the effect of the condemnation.  As a result, the Court has considered whether it should defer resolution of GCSD's motion to enforce the arbitration award until after the Tribal Court has ruled on the issues pending before it.  For several reasons, the Court has concluded that such delay

is not necessary or appropriate.

First, there is no question that jurisdiction over the arbitration award lies in this Court. The Court has subject-matter jurisdiction because the parties have diversity of citizenship[6] and both the FAA and the 2003 Agreement acknowledge the jurisdiction of this Court to enforce the arbitration award.[7] Additionally, both parties have asked this Court to rule on motions respecting such enforcement. SNW has specifically asked the Court to deny enforcement of the arbitration award on the basis of the condemnation, and has not asked the Court to defer ruling on this issue until after the Tribal Court proceedings have been completed.

Second, although principles of comity require tribal court exhaustion even when there is federal court jurisdiction, *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 16 n. 8 (1987); *Stock West,* 873 F.2d at 1230, this is only to the extent that examination of "the existence and extent of a tribal court's jurisdiction . . . be conducted in the first instance in the Tribal Court itself." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985); *see also Iowa Mutual,* 480 U.S. at 16 ("[T]he federal policy supporting tribal self-government directs a federal court to stay its hand in order to give the tribal court a full opportunity to determine its own jurisdiction."). Here, the Hualapai Tribal Court has already ruled that is lacks jurisdiction concerning arbitrations under the 2003 Agreement:  "The express limited waiver combined with the Choice of Law for

---

[6] For purposes of federal court jurisdiction, an Indian corporation is the citizen of the state in whose borders its reservation is located.  *Stock West, Inc. v. Confederated Tribes of the Coleville Reservation*, 873 F.2d 1221, 1226 (9th Cir. 1989).  SNW is therefore a citizen of Arizona, and GCSD is a citizen of Nevada.

[7] The FAA provides that "[i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award[.]"  9 U.S.C. § 9.  As discussed in relation to the 2003 Agreement, SNW specifically waived its sovereign immunity for "[a]n action in a federal court of competent jurisdiction in Arizona to . . . enforce a determination by an arbitrator[.]"  Doc. 7-1 at 95, 2003 Agreement, § 15.4(d)(iii).  Even without such specification, the FAA goes on to state that "[i]f no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made."  9 U.S.C. § 9.

arbitration constitutes a mutually agreed upon forum selection.  This negotiated forum selection eliminates enforcement of arbitration in Hualapai court in this case only."  Doc. 1-1 at 76, ¶ 10, Aug. 2, 2011 Hualapai Tribal Court Order.  The Tribal Court expressly recognized that, for purposes of compelling arbitration, "[t]he Plaintiff has exhausted all tribal court remedies and may seek resolution in federal court pursuant to § 15.4 of the Agreement."  *Id.* at 77.  Jurisdiction over enforcement of an arbitration award rests on the same provision of the 2003 Agreement cited by the Tribal Court.  Doc. 1-1 at 43, 2003 Agreement, § 15.4.  The fact that litigation over the effect of the Tribe's condemnation action is currently pending before the Tribal Court does not mean that the Court must stay its hand in deciding the effect of the condemnation as it relates solely to the validity of the arbitration process – a process over which the Tribal Court has already found it has no jurisdiction.

Third, the issue presented in this case is much narrower than the issues pending in Tribal Court.  The Tribal Court action will address the validity of the condemnation ordinance and action under the Tribe's constitution and tribal procedures, the effect of the condemnation on the Skywalk and assets related to the Skywalk, and the valuation of the property condemned by the Tribe.  For purposes of deciding whether the arbitrator exceeded his authority, this Court need decide only a narrow question: assuming (without deciding) that the Tribe validly condemned GCSD's contract rights under the 2003 Agreement, did the taking extend to GCSD's chose in action for breach of contract and its right to arbitrate that claim?  Deciding this issue will not interfere to any significant degree in the litigation of broader condemnation issues in Tribal Court.

Fourth, SNW and GCSD agreed that arbitration issues should be decided promptly.  The 2003 Agreement states that "[p]rompt disposal of any dispute is important to the parties" and provides for arbitration under the agreement to be completed within 120 days.  *See* Doc. 7-1 at 94, § 15.4(a).  Although the arbitration in this case took more than 120 days because of the complexity of the issues and the Tribe's attempt to have the arbitration dismissed, further delay in entering final judgment on the arbitration award

1   would be contrary to the parties' clear intent to resolve arbitration issues quickly.

2       For these reasons, the Court concludes that it should rule now on the

3   condemnation issue presented by SNW.  The Court need not await completion of Tribal

4   Court proceedings on broader issues.

5       **a.   Did the Tribe Take GCSD's Cause of Action?**

6       "Eminent Domain is the power of the sovereign to take property for 'public use'

7   without the owner's consent."  *Nichols on Eminent Domain* § 1.11 (3d ed. 1980); *see, e.g.*

8   *United States v. Jones*, 109 U.S. 513, 518 (1883) ("The power to take private property for

9   public uses, generally termed the right of eminent domain, belongs to every independent

10  government.").   This power extends to all property within the jurisdiction of the

11  sovereign.  *Nichols*, § 2.01.  Both real and personal property are within the scope of

12  eminent domain.  *See id.*, § 2.01[1] & [2].  "Intangible property, such as choses in action,

13  patent rights, franchises, charters, or any other form of contract, are within the scope of

14  this sovereign authority as fully as land or other tangible property."  *Id.*, § 2.01[2] (citing

15  cases); *see. e.g.*, *City of Cincinnati v. Louisville & Nashville R.R. Co.*, 223 U.S. 390, 400

16  (1912) ("Every contract, whether between the state and an individual, or between

17  individuals only, is subject to this general law.").  The payment of just compensation is

18  an essential element of the valid exercise of this power.  *Nichols*, § 1.11.

19      Courts have specifically recognized the power of the sovereign to take the

20  intangible contract rights of business enterprises operating within their jurisdiction.  *See,*

21  *e.g.*, *City of Oakland v. Oakland Raiders*, 646 P.2d 835, 843 (Cal. 1982) (recognizing the

22  operation of a sports franchise as an appropriate municipal function for purposes of the

23  City's exercise of eminent domain); *c.f. Mayor & City Council of Baltimore v. Baltimore*

24  *Football Club*, 624 F.Supp. 278, 284-87 (D. Md. 1985) (finding NFL franchise that had

25  moved its operations outside the jurisdiction of Baltimore was no longer subject to the

26  City's power of eminent domain).

27      As previously noted, however, the question to be decided is not whether the

28  Tribe's purported taking of the physical property of the Skywalk and GCSD's contract

rights to manage the operation of that enterprise are within the Tribe's eminent domain authority, but whether such authority extends to the taking of GCSD's cause of action that had already accrued under the 2003 Agreement and had been asserted in arbitration prior to the Tribe's condemnation.  The right to sue for breach of contract is a personal property right that is separate from, and generally survives the sale, assignment, or termination of, the contract itself.  *See, e.g.*, *Wesco v. Kern*, 59 P. 548, 549 (Or. 1900) ("There is no merit . . . in the contention that the foreclosure and sale . . . is a bar to plaintiff's right of action to recover damages for a breach occurring prior to the commencement of the foreclosure suit."); *Welch v. Monroe*, 2004 WL 2474504, *2 (Ct. App. Tex. Nov. 3, 2004) (holding that previous owner of property retained standing to sue for injury to the property during his ownership, despite the fact that he had later sold the property).  The right to sue also does not ordinarily pass to the successor of a contract unless it has been expressly assigned.  *Welch*, 2004 WL 2474504, *2-3; *Wallace v. Paulus Bros. Packing Co.*, 231 P.2d 417, 419 (Or. 1951) ("As grantees, plaintiffs acquired no rights in and to the said cause of action, because it is not alleged nor claimed that the corporation assigned the same to them.  Though the covenant to repair runs with the land, a cause of action for a breach thereof does not."); *Gibbons v. Tenneco, Inc.*, 710 F. Supp. 643, 648-49, 652 (E.D. Ky. 1988) (distinguishing between a clause in a right-of-way agreement that runs with the land and a chose in action for breach of that clause that does not run with the land unless specifically assigned).

SNW argues that unlike an ordinary assignee to a contract, the Tribe by virtue of its power of eminent domain assumed the position of GCSD as the original party to the 2003 Agreement, thus vesting in itself all of GCSD's property rights under the agreement, including causes of action that had accrued prior to the taking.  Doc. 14 at 9. SNW rests its argument on the wording of the Tribe's eminent domain ordinance – drafted and enacted after the arbitration had commenced – which provides that "the Tribe becomes 'the party thereto in the full place and stead of the defendant, to the full extent as if the Tribe and not the defendant were the ***original signator or party thereto***.'"

Doc. 14 at 8 (quoting Hualapai Law & Order Code § 2.16(F)(4)(a), Doc. 7-2 at 152) (emphasis added by SNW).  This language also appears in the Tribe's declaration of taking submitted in the Hualapai Tribal Court after the arbitration commenced.  Doc. 1-2 at 152 ("the Tribe shall be the party [to the Skywalk Agreement] in full place and stead of GCSD").

But even if the Court were to read the broad language of the Tribe's ordinance and its declaration of taking as meaning that GCSD's existing cause of action immediately became the property of the Tribe as if the Tribe, not GCSD, had been the contracting partner with SNW from the beginning – in effect, writing GCSD out of the contract for all purposes except just compensation – the Court is not persuaded that the sovereign power of eminent domain is expansive enough to support such a purported statutory right. Although *Nichols* refers to choses in action as being within the scope of a sovereign's eminent domain power, *Nichols* relies on *City of Cincinnati v. Louisville & Nashville R.R. Co.*, 223 U.S. 390, 400 (1912), which states only in dicta that the sovereign power of eminent domain "extends to tangibles and intangibles alike.  A chose in action, a charter, or any kind of contract, are, along with land and movables, within the sweep of this sovereign authority."  The Court included virtually no analysis as to when a chose in action might be subject to eminent domain.  *City of Cincinnati* dealt with the City's taking of a railroad's asserted contract right to build a bridge across public land.  223 U.S. at 399-400.  The Court found that the City had the right to take the railroad's contract right for a public purpose, subject to just compensation.  *Id.* at 407.  No pre-existing causes of action under the contract were at issue.  *Nichols* itself merely cites to *City of Cincinnati* without further elaboration as to when a chose in action is a proper subject for taking under eminent domain.  § 2.01[2].

SNW offers no additional support for the proposition that a chose in action that would not otherwise run with either the physical property or the 2003 Agreement can nonetheless be taken as part of an eminent domain action taking the physical property and the contract.  As already noted, choses in action for breach of contract are separate

property rights from the rights existing under a contract.

Moreover, even if the Tribe could condemn a chose in action, it could do so only with respect to a chose in action located within its jurisdiction. *See Nichols*, § 2.01 (condemnation power extends to all property within the jurisdiction of the sovereign). GCSD is not a corporation located on tribal land. It is a Nevada corporation with its principal place of business in Las Vegas, well outside the geographical boundaries of the Tribe. The chose in action that arose from SNW's breach of the 2003 Agreement belongs to GCSD. It is personal property of a Nevada corporation and is not physically located on the Tribe's land like a truck or desk GCSD placed at the Skywalk. True, the chose in action is related to events that occurred on tribal land, but so are the computer servers in GCSD's Las Vegas office that were used to store information related to Skywalk operations, and the Tribe certainly cannot claim that its condemnation power extends to computer servers in Las Vegas. Thus, even if the Tribe had power to condemn a chose in action, this power would not reach a chose in action belonging to a Nevada corporation with its principal place of business well outside the boundaries of the tribe.

SNW disputes that the chose in action at issue in the arbitration is outside of the Tribe's jurisdiction. It argues that the Ninth Circuit has rejected a bright line rule that contract rights are sited with the contract owner and has, instead, adopted a multi-factor test to determine the locus of a contract. Doc. 14 at 10 (citing *R.J. Williams Co. v. Fort Belknap Housing Auth.*, 719 F.2d 979, 985 (9th Cir. 1983)). But the case to which SNW points dealt with the locus of a contract *dispute* for purposes of determining a tribal court's jurisdiction to hear the controversy. It did not deal with the locus of a foreign corporation's intangible breach of contract claims for purposes of exercising eminent domain over such claims. Similarly, none of the cases relied on by the Tribe in its supplemental briefing to the Tribal Court, to which SNW points (Doc. 14 at 10), dealt with the locus of a party's chose in action for purposes of exercising eminent domain. *See* Doc. 14-3 at 5-7. *Curry v. McCanless*, 307 U.S. 357, 367 (1939), dealt with whether a non-resident had sufficiently availed himself of the protection of a state to be subject to

its authority to tax, not its power of eminent domain.  *City of Oakland*, 646 P.2d 835, and *Mayor & City Council of Baltimore*, 624 F.Supp. 278, the two takings cases noted above, dealt with whether a sovereign had jurisdiction to take ongoing management rights – not accrued choses in action – under a franchise agreement.  And neither case upheld the jurisdiction of the cities to effectuate the takings.  *City of Oakland* denied summary judgment because factual issues remained as to the applicability of the City's statutory limitations on the purported taking.  646 P. 2d at 844.  *Mayor & City Council of Baltimore* specifically rejected the theory put forth by the City that minimum contacts between a sports franchise and the City gave the City jurisdiction to take the owners' intangible contract rights.  624 F.Supp. at 284.

Even if the location of the Skywalk on tribal land gave the Tribe jurisdiction and a sufficient public interest to exercise eminent domain over GCSD's management rights of the Skywalk operation, this is not a basis for concluding that the separate chose in action belonging to GCSD is subject to the Tribe's jurisdictional reach.  Any reliance SNW places on the wording of the Tribe's own ordinance to enlarge the reach of the Tribe's eminent domain power is misplaced.  Eminent domain is "an incident of sovereignty," not of statutory creation.  *Jones*, 109 U.S. at 518.  Statutory or constitutional provisions may limit this power, but they may not enlarge it beyond the domain of the sovereign.  Significantly, the Tribe in the above-referenced brief argued only that it had the right to take GCSD's license to build and manage the Skywalk on tribal land, not its claims then subject to arbitration.  Doc. 14-3 at 5-5, 7-8.  The above-referenced takings cases cited by the Tribe also pertained only to the right to operate and manage a franchise.  The situs analysis employed in those cases and urged by SNW here simply does not apply to GCSD's chose in action.  The chose in action has no bearing on GCSD's right to operate the Skywalk under the 2003 Agreement and no bearing on the use of Hualapai land.  It pertains only to damages resulting from SNW breaches of the 2003 Agreement that occurred prior to the Tribe's exercise of eminent domain power.

Nor has SNW put forth any public purpose that would be served by the Tribe's taking of GCSD's breach of contract claim.  Taking the Skywalk itself could arguably serve the public purpose of preserving a valuable tribal asset that is essential to the Tribe's financial welfare.  Taking contract management rights over the Skywalk likewise could arguably be viewed as preserving the Tribe's ability to preserve the Skywalk.  But the breach of contract claim against SNW does not implicate the Tribe's ability to preserve or manage the Skywalk.  It is a claim for money damages, and the Tribe's can hardly claim that permitting such a claim is contrary to the public interest when SNW, with Tribal Council approval, agreed to permit such a claim in the 2003 Agreement.  Doc. 1-1 at 43, § 15.4(a).

For these reasons, the Court concludes that there is no basis for finding that GCSD's chose in action is subject to the Tribe's eminent domain action.

### b.    Did the Tribe Take GCSD's Right to Arbitrate?

Contrary to the position argued in its briefs, SNW asserted at oral argument that the Tribe did not take GCSD's chose in action, but instead took GCSD's right to arbitrate the chose in action under the 2003 Agreement.  This argument has a familiar ring.  SNW again is suggesting that GCSD has a right under the 2003 Agreement that it cannot enforce.  A finding that GCSD retained its breach of contract claim under the 2003 Agreement, but lost the right to arbitrate that claim when the Tribe exercised its eminent domain power, would render the claim valueless and would defeat the contracting parties' express intent for how claims between SNW and GCSD were to be resolved.

The Court has already found that GCSD validly commenced arbitration under the 2003 Agreement before the condemnation action occurred.  SNW argues that the Tribe not only had the power through eminent domain to take GCSD's ongoing and future contract rights under the 2003 Agreement, but also to take a remedy that GCSD had already exercised under the agreement.  The Court finds no authority for the proposition that a sovereign may retroactively take intangible contract rights from a party that has already exercised them.

And, as with the claim that the Tribe condemned GCSD's chose in action, SNW fails to identify what public good would be served by depriving GCSD of its agreed-upon method for resolving its pre-existing contract disputes. The Tribe has disavowed any intention itself to arbitrate those disputes in GCSD's stead. *See* Doc. 7-2 at 170. In short, the Court finds no basis for SNW's position that the Tribe took GCSD's right to arbitrate its claims.

### 3.    Conclusion.

The arbitrator did not exceed his authority when he found that the arbitration had been properly commenced. Additionally, the Tribe's eminent domain action did not take GCSD's chose of action or its right under the 2003 Agreement to arbitrate its claims. The Court therefore concludes that the arbitrator did not exceed his powers when he permitted the arbitration to proceed to a final hearing and issued a final judgment for GCSD and against SNW.

Because SNW has presented no other grounds for vacating the award, the Court will deny SNW's motion to vacate and dismiss the award. Pursuant to 9 U.S.C. § 9, under which the Court must enforce an arbitration award "unless the award is vacated, modified, or corrected[,]" the Court will grant GCSD's petition. The Court will confirm the award as set forth in the arbitration order.

**IT IS ORDERED:**

1.    Petitioner Grand Canyon Skywalk Development, LLC's application for confirmation of an arbitration award (Doc. 1) is **granted**.

2.    Respondent 'Sa' Nyu Wa, Inc.'s motion to vacate the arbitration award and dismiss this matter (Doc. 7) is **denied**.

3.      Respondent 'Sa' Nyu Wa, Inc. shall remit damages in the amount of $28,572,810.25 to Grand Canyon Skywalk Development, LLC, as set forth in the August 16, 2012 Arbitration Order.

Dated this 8th day of February, 2013.

David G. Campbell
United States District Judge